## LUBRIKO CO. v. WYMAN.

(Circuit Court of Appeals, Third Circuit.   June 12, 1923.)

No. 2875.

1. **Master and servant ⬅1—Sales manager held merely agent or servant of corporation.**

   One employed by corporation as sales manager on commission became simply its agent or servant, and the corporation did not relinquish its right to formulate its business policy and direct its business affairs.

2. **Master and servant ⬅30(3)—Discharge of sales manager justified by breach of duty of faithful service.**

   Where plaintiff was employed by corporation as sales manager the duty of faithful service was implied, and breach of such duty was breach of contract and justifiable ground for discharge, whether known by employer at time of discharge or discovered later.

3. **Master and servant ⬅30(5)—Discharge justified by disobedience or insubordination.**

   Conduct of servant involving insolent and disrespectful language, disobedience of orders of superiors, or tending to prejudice or injure his master's business, or amounting to insubordination, justifies discharge.

4. **Master and servant ⬅43—Conduct justifying discharge question for court, when undisputed and unaffected by mitigating considerations.**

   When servant's conduct is not in dispute and is not affected by mitigating or extenuating considerations, it is for the court to determine as matter of law whether it constituted cause for discharge.

5. **Master and servant ⬅43—Justification for discharge question for jury when facts in dispute.**

   Where the facts are in dispute, what constitutes grounds justifying discharge of servant is a question for the jury.

6. **Master and servant ⬅30(5)—Provocation to be considered in determining whether or not conduct justified discharge.**

   In determining whether there was breach of duty by servant, and justification for discharge arising from improper language or conduct, the element of provocation must be considered.

7. **Master and servant ⬅43—Question of justifiable discharge for jury, when question of condonation involved.**

   The question of justifiable discharge of a servant was properly one for the jury, where the question was fairly involved whether the servant's conduct had been in part condoned, or was of such continuing character as not to admit of condonation.

8. **Evidence ⬅215(3)—Letter not showing to what writer referred not admissible as admission.**

   Letter written by plaintiff, expressing alarm because addressee had revealed conversation, but not showing to what the writer referred, could not be admitted as an admission, and the jury allowed to conjecture that defendant referred to the same matter about which the addressee testified.

9. **Evidence ⬅215(3)—Letter, to constitute admission, must admit some fact.**

   A letter, to be an admission against interest, must itself show an admission of some fact.

10. **Master and servant ⬅35—Rule as to recovery for constructive service following discharge prevails in Pennsylvania.**

    In Pennsylvania, wrongfully discharged servant, instead of suing for breach of contract at once or at end of the contract period, may treat contract as subsisting and sue for salary from time to time as it comes due by virtue of the special contract and recover for the whole term, less

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

such sums as he has earned or might have earned, on theory that his readiness to serve was equivalent to actual service.

11. **Courts ⬅➡359—Federal court will follow state law as to recovery on contract of employment to be performed in such state.**

Though contract of employment was signed in Canada, where it was made with corporation having principal place of business in Pennsylvania, and its performance involved sales management of that corporation, the law of Pennsylvania as to recovery for constructive service following wrongful discharge will be applied in suit brought in federal court sitting in Pennsylvania.

12. **Courts ⬅➡365—Federal court follows decisions of state courts, when no federal question involved.**

When case is brought in federal court solely by reason of diversity of citizenship and involves no federal question and the law invoked, whether common or statutory law, is of local character, and has become established as part of the state law, the federal court will follow decisions of state court of last resort.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action by Webster W. Wyman against the Lubriko Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Charles J. Hepburn and Herbert G. Stockwell, both of Philadelphia, Pa., for plaintiff in error.

Franklin Spencer Edmonds and Leon J. Obermayer, both of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The Lubriko Company, the defendant, is a corporation engaged in the manufacture and sale of automobile lubricants. Webster W. Wyman, the plaintiff, had been its sales agent for several years, holding valuable exclusive sales agency contracts in thirty-three states. By virtue of these contracts he had obtained profitable personal contracts with distributors for the purchase, through him, of Lubriko products for varying terms, some running for as long as ten years. On these contracts the company paid him during the year 1918 more than $13,000 in commissions. Having demonstrated that he was an excellent salesman, J. C. Pierson, the president of the company, pursuaded Wyman to submit to a cancellation of his exclusive sales agency contracts, surrender his trade paraphernalia, and transfer to the company his personal contracts with distributors, and in return the company would, as later it did, enter into a contract with him as its sales manager for a term of ten years from October 1, 1918, paying for his services, in lieu of salary, one cent per pound on all sales of Lubriko products in any part of the world, exclusive of Canada.

Wyman entered upon his duties on the day named in the contract. Immediately difficulties arose. These were due to a variety of circumstances and developed into a highly unpleasant situation. In the first place the little corporation was without a head. Pierson, the president and owner of nearly all its stock, spent his summers in Canada and his winters in Florida, visiting the office only occasionally. Miss

Anna May Collins was vice president and James Frazer was secretary and treasurer. They ran the business and had their own ideas as to how it should be done. Wyman, having under his contract "the usual authority vested in a sales manager," had decidedly different ideas and tried to enforce them. Petty jealousies on the part of Miss Collins and Frazer, and Wyman's exaggerated notion of his newly acquired importance, added nothing to the peace of the organization. On the first day of his new employment, Miss Collins informed Wyman that they had decided not to elect him a director and thereby bring him into "the family," as had been promised. This started the trouble. Wyman's manners were not the best and his language was violent and abusive when addressing Miss Collins and Frazer and when talking to others about them. On the other hand, while the manners and language of these officials are not impugned, their conduct toward Wyman was, at least, irritating. Wyman talked freely to other employees about them, using language and displaying a feeling which tended to the breaking down rather than to the upbuilding of the sales organization of the company. On the other hand Wyman's efforts in his sales department were checked and at times thwarted by Miss Collins and Frazer, thus tending to limit the effectiveness of the work which it is conceded he was amply able to do. As he had surrendered valuable sales agency contracts in exchange for an income dependent upon the volume of sales, and as he thus had a substantial personal interest in the company's output, Wyman was irritated by opposition and his profanity increased with his irritation. Miss Collins and Frazer seemed to regard Wyman's activities as an effort on his part to undermine their official authority. Wyman viewed the conduct of Miss Collins and Frazer as an effort on their part to cripple the sales department. While some of the things Wyman said and did might easily be construed as insubordination, the evidence on the other hand seems to indicate that he, though ugly about it, obeyed the orders of his superiors and was always "loyal to the product." Nor does it appear that he was abusive or disloyal to the president. Whatever his short comings, Wyman's employer was acquainted with them. Having been with the company for several years, they did not meet as strangers when they entered into the contract. Many acts done and things said by Wyman which are now relied upon in justification of what ultimately happened were overlooked, or, it may be, were held in suspense for future action according as Miss Collins might revive them from memoranda of his doings and sayings which she carefully made and filed away. These notes were taken from her desk, presumably by a stenographer who was sympathetic with Wyman. Coming to Wyman's knowledge, they added fuel to the fire. So, early in April, 1919, Miss Collins wired Pierson in Florida to come to Philadelphia and take some action. Wyman, who was on the road selling goods, was ordered home. When the two men met in the office of the company, Pierson asked Wyman for the contracts with distributors which he had caused to be transferred from himself under the old arrangement to the company under the new arrangement. Wyman handed them to Pierson and then Pierson discharged him.

Wyman brought this suit on the contract for commissions. Before trial the company paid him to the date of his discharge and counsel stipulated that the case should go to the jury solely as to the amount due him from the date of his discharge to about the date the suit was brought. On this stipulation the sole question tried to the jury was whether the discharge was justified. The jury rendered a verdict for the plaintiff and the case is here on the defendant's writ of error.

We are quite aware that we have stated the case by giving the permissible inferences from the testimony rather than by giving the testimony itself. We have done this for the reason that a recital of this long and unpleasing story would not illumine the questions we have to decide, and for the purpose of showing that the testimony was susceptible of different inferences, and that, accordingly, the learned trial judge properly submitted it to the jury. From the testimony the jury could divide Wyman's conduct into two classes,—that which was offensive to his superiors and that which constituted offenses against his employer, and, in deciding how far they went toward a justification for his discharge, the jury could measure the amount of provocation that figured in the situation and the extent to which condonation, if any, played a part. Contrary to the very earnest insistence of counsel for the plaintiff in error we are of the opinion that these issues were, in varying degrees, controverted, and that there was sufficient evidence for the jury, if properly instructed on the law, to find a verdict either way.

[1-6] The law applicable to the facts developed by the testimony is briefly this: Wyman became simply the agent or servant of the Lubriko Company. Thereby that corporation, as employer or master, relinquished nothing of its right to formulate its business policy and direct its business affairs. That Wyman, the servant, owed his master the duty of faithful service was implied, if not expressed, in the contract of employment. Carpenter Steel Co. v. Norcross, 204 Fed. 537, 123 C. C. A. 63, Ann. Cas. 1916A, 1035. A breach of this duty amounted to a breach of contract which, if such occurred, was a justifiable ground for his discharge. And this is so whether his conduct was known by the master at the time of the discharge or was discovered later. Farmer v. Trust Co., 246 Fed. 671, 158 C. C. A. 627, L. R. A. 1918C, 1027; 2 Williston on Contracts, § 839; 18 R. C. L. 517. Faithful service is of course a condition precedent to the right of wages. Therefore conduct of a servant involving insolent and disrespectful language, or disobedience of orders of a superior, 2 Williston on Contracts, § 1020; Darst v. Alkali Works (C. C.) 81 Fed. 284; O'Neil v. Schneller, 63 Pa. Super. Ct. 196; or tending to prejudice or injure his master's business, Carpenter Steel Co. v. Norcross, 204 Fed. 537, 123 C. C. A. 63, Ann. Cas. 1916A, 1035; or, what is more serious, amounting to insubordination, Peniston v. Huber Co., 196 Pa. 580, 46 Atl. 934, justifies the discharge of the servant. When the servant's conduct is not in dispute and is not affected by mitigating or extenuating considerations it is for the court to determine, as matter of law, whether it constitutes cause for his discharge. Peniston v. Huber Co., 196 Pa. 580, 46 Atl. 934. But where the facts

are in dispute, what constitutes a ground justifying a discharge is a question for the jury. 1 Labatt's Master and Servant (2d Ed.) 932; O'Neil v. Schneller, 63 Pa. Super. Ct. 196; Peniston v. Huber Co., 196 Pa. 580, 46 Atl. 934; Thomas v. Beaver Dam Mfg. Co., 157 Wis. 427, 147 N. W. 364, Ann. Cas. 1916A, 1020; Wade v. Hefner Mfg. Co., 16 Ga. App. 106, 84 S. E. 598; Stover Mfg. Co. v. Lutz, 42 Ill. App. 230. This must be so, because in determining a question of breach of duty arising from improper language or conduct, and hence in determining a question of justification for a discharge grounded thereon, the element of provocation, in some degree, is more than like-ly to enter and must be considered. To hold otherwise would mean that although the master may goad the servant into desperation, yet, if the servant does not submit respectfully he forfeits the right to retain his employment under the contract. Dorrance v. Hoopes, 122 Md. 344, 90 Atl. 92, Ann. Cas. 1916A, 1012; Ross v. Grand Pants Co., 170 Mo. App. 290, 156 S. W. 92; Wade v. Hefner, 16 Ga. App. 106, 84 S. E. 598; Kirley v. Thom, 32 Pa. Super. Ct. 130.

[7] On the law applied to the facts of this case, the question of justifiable discharge was properly one for the jury on the further ground that there was involved a fair question whether the servant's conduct had been in part condoned or was of such continuing charac-ter as not to admit of condonation. Jordon v. Weber Moulding Co., 77 Mo. App. 572, 577; Leatherberry v. Odell (C. C.) 7 Fed. 641; Batchelder v. Elevator Co., 227 Pa. 201, 75 Atl. 1090, 19 Ann. Cas. 875; In re Nagel, 278 Fed. 105; Johnson v. Machine Works, 130 N. C. 441, 41 S. E. 882; Jerome v. Queen City Co., 163 N. Y. 351, 57 N. E. 485; 18 R. C. L. 517.

[8, 9] These familiar principles of law were covered in the charge and the case was properly sent to the jury on the testimony admitted. But the defendant, here the plaintiff in error, assigns error on the rejection of testimony. The only matter which we think calls for comment is a letter addressed to Rhineberg, an under-salesman, and written by Wyman in evident agitation after he had discovered, fol-lowing his discharge, that Rhineberg had revealed to "F. and C." a conversation he had with him before his discharge. We are asked to infer that "F. and C." are Frazer and Miss Collins. The letter was offered as an admission against interest. Standing alone it showed only the writer's alarm. Being offered on proof of signature by the plaintiff when on the stand in the opening of the case, it evidently con-veyed nothing to the judge and could not have conveyed anything to the jury. Toward the end of the case, Rhineberg testified. The defendant maintains that the letter reads on his testimony, as the matter would be stated in a patent argument. It may and it may not. What the letter contains is at best innuendo. To be an admission against in-terest the letter itself must show an admission of some fact. It can-not serve such evidentiary purpose if the jury were allowed to con-jecture that the writer meant what later Rhineberg testified to. If, to translate Wyman's letter we must use Rhineberg's testimony, Rhine-berg becomes the witness and the letter ceases to be an admission. The trial court committed no error in rejecting the letter.

The remaining question, raised by the defendant on a request to charge, which was declined by the court, is whether the plaintiff is entitled to recover the amount of his compensation for the months subsequent to his discharge even if the jury found that he was improperly discharged.

[10] This request attacked the plaintiff's right to recover upon a service constructively rendered. The defendant argued the question as though it were one of first impressions in this court and, accordingly, as though this court were free to adopt or reject the principle as it chose. The doctrine of constructive service is familiar. It is really a third option of suit given an employé for a fixed term who has been wrongfully discharged. He may, in nearly all jurisdictions, sue for breach of contract at once or at the end of the contract period. If he elect the first remedy, while the suit is for the actual loss he has sustained, the recovery is problematical because depending upon many variable factors; if he elect the second remedy he may encounter other factors of equal uncertainty. See 3 Williston on Contracts, § 1362. Therefore, some jurisdictions permit him, as a third remedy, to treat the contract as subsisting and to sue for his salary as, from time to time, it becomes due, not on a quantum meruit, but by virtue of the special contract, his readiness to serve being considered as equivalent to actual service. Thus recovery is allowed him for the whole term, less such sums as he has in the meanwhile earned in other employment or might have earned in employment offered him and refused, and thereby his actual loss is more certainly regained. Of these jurisdictions Pennsylvania is one. Allen v. Colliery Engineers' Co., 196 Pa. 518, 46 Atl. 899; Kirk v. Hardman, 63 Pa. 97. For a discussion of the doctrine, see McMullan v. Dickinson, 60 Minn. 156, 62 N. W. 120, 27 L. R. A. 409, 51 Am. St. Rep. 511; Howard v. Daley, 61 N. Y. 363, 19 Am. Rep. 285; 8 A. L. R. 338, and 17 A. L. R. 629.

[11, 12] While the contract in suit was signed in Canada it was made with a corporation whose principal place of business is in Pennsylvania. Its performance involves the sales management of that corporation. Suit was brought in the District Court of the United States for the Eastern District of Pennsylvania. What law should the District Court have followed in allowing recovery, the law of Pennsylvania or federal law? Broadly speaking the rule is that when the decision in a federal court involves no federal question, the case being there solely by reason of diversity of citizenship, and when the law invoked, whether common law or statutory law, is of local character and has become established as a part of the law of the state, a federal court will follow the decisions of the state court of last resort when decisions of that court exist. Snare & Triest Co. v. Friedman, 169 Fed. 1, 94 C. C. A. 369, 40 L. R. A. (N. S.) 367, certiorari denied 214 U. S. 518, 29 Sup. Ct. 700, 53 L. Ed. 1065. As the Supreme Court of Pennsylvania early adopted and has long applied the doctrine of constructive service in cases of this kind we are of opinion that the learned district judge was right in applying that law to this case.

Limiting this decision to the plaintiff's right to recover on the contract of service for the period following his ·discharge, as stipulated by counsel before entering upon trial, the judgment below. is affirmed.