LOVELL & MALONE, INC.,                    )
                                          )
        Plaintiff/Appellee,               )
                                          )        Appeal No.
                                          )        01-A-01-9607-CH-00299
VS.                                       )
                                          )        Davidson Chancery
                                          )        No. 93-2525-II(III)
COMMONWEALTH LIFE INSURANCE )
COMPANY and CAPITAL HOLDING     )
CORPORATION,                              )
                                          )
        Defendants/Appellants.            )

FILED

February 21, 1997

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE


APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE ROBERT S. BRANDT, CHANCELLOR



FRED E. COWDEN, JR.
211 Third Avenue North
P. O. Box 198288
Nashville, Tennessee 37219
        Attorney for Plaintiff/Appellee

WILLIAM R. O'BRYAN, JR.
MARY ELLEN MORRIS
TRABUE, STURDIVANT & DEWITT
511 Union Street
2500 Nashville City Center
Nashville, Tennessee 37219-1738
        Attorneys for Defendants/Appellants



AFFIRMED AND REMANDED




                                        BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J.
LEWIS, J.

# O P I N I O N

The Chancery Court entered a judgment for the plaintiff mortgage loan correspondent, finding that the defendant insurance company had breached the correspondent agreement by refusing to pay the required termination fee after terminating the contract without cause. The insurance company argues on appeal that it was not obligated to pay the fee, because valid grounds existed for the termination. We affirm the trial court.

## I.

On October 1, 1962, Lovell & Malone, Inc., executed a mortgage correspondent agreement with Commonwealth Life Insurance Company, a wholly owned subsidiary of Capital Holding Corporation (hereafter Capital). In the contract, Lovell & Malone agreed as correspondent to originate and service residential and commercial loans for Capital. Article VI of the contract specified the manner in which the parties could terminate the contract, and their rights and obligations following termination.

Each party had the right to terminate the agreement with or without cause by sending a written notice of the termination to the other party by registered mail at least ninety days before the scheduled termination date. If it terminated the agreement without cause, Capital was obligated to pay Lovell & Malone one percent (1%) of the outstanding principal amount being serviced for it by the correspondent at the time of termination. If the termination was for cause, then no money would be due. Circumstances constituting cause were listed in the same section, and will be discussed later in this opinion.

In 1985, Capital submitted a new correspondent contract to Lovell & Malone for review. The termination clause in the new contract eliminated the fee for termination without cause. William C. Boyers, then president of Lovell & Malone, objected by letter to the change, but stated that he would be willing to accept it for future loans, as long as the 1% provision remained in place for loans acquired under the old contract.

In a letter dated December 12, 1985, Paul Edberg, Capital's Director of Asset Management, agreed that the 1962 contract would remain in force for all existing loans, and that the new contract would only cover future loan production, beginning on January 1, 1986.

## II.

In the spring of 1991, a holding company owned by the wife of J. Thomas Holland purchased the stock of Lovell & Malone, and Mr. Holland took over as president of the mortgage correspondent. In September of that year, Mr. Holland travelled to Capital's headquarters in Louisville to introduce himself to that company's management, and to see if he could obtain their agreement to originate residential loans on their behalf.

Capital had ceased to accept residential loans sometime in the 1960's, but had resumed residential lending in 1987, concentrating on so-called "jumbo" non-conforming loans. Lovell & Malone had voluntarily taken itself out of residential lending in the early 1980's to concentrate on commercial lending, but was now interested in returning to the Nashville residential market.

Capital's residential loan production officer, Mr. Craig Atchley, advised Mr. Holland that unless he could originate mortgage loans in the Nashville area in the amount of twenty-five to thirty million dollars per year, Lovell & Malone would not be permitted to make residential loans on Capital's behalf. Mr. Holland felt that his company might be able to originate ten million dollars in residential loans each year or two, but in view of the size of the lending market and the number of competing firms in the area, he could not guarantee the higher volume demanded by Capital.

During this same visit, Mr. Holland spoke to Mr. Ray Brewer, who was apparently Mr. Atchley's counterpart on Capital's commercial loan side. Mr. Holland advised Mr. Brewer about the possibility of Lovell & Malone originating a loan of about ten million dollars on a building owned and occupied by Southwestern Publishing Company in Nashville, but Mr. Brewer said his company was not interested in making that loan, because of the high valuation placed on the property.

### III.

In September of 1992, Capital's director of residential servicing, Kenneth K. Hodge, called Mr. Holland, and told him that the holding company had decided to terminate its contracts with its smaller correspondents, including Lovell & Malone. Mr. Holland later testified that no cause for termination was discussed, other than Capital's desire to deal with a smaller number of loan producers, and no fee for termination was mentioned. However, in a letter dated September 22, 1992, Mr. Hodge wrote:

> "This letter confirms our agreement to transfer the servicing of the loans serviced by Lovell & Malone under the subject agreement to our offices in Louisville. As we discussed, no cancellation and/or transfer fees will be due to Lovell & Malone for the transfer of the servicing."

Mr. Holland responded with a letter dated September 25, 1992, and enclosed with it copies of the 1962 and 1985 contracts and the December 12, 1985 letter from Mr. Edberg. In his own letter, Mr. Holland stated that he and Mr. Hodge had never discussed the termination fee, and that Lovell & Malone was determined to collect the fee for the remaining balance on the loans it originated prior to 1986, a fee amounting to $136,881.

Mr. Hodge subsequently shifted his ground with a letter dated October 1, 1992. That letter stated that no termination fee was due because termination was for cause under Article 6.02(e) of the correspondent agreement, which allows immediate termination for the following reason:

> 6.02(e) Inability of Correspondent to perform satisfactorily its duties and obligations, including the producing of a reasonable and satisfactory volume of mortgage loans for the Company's account from the area served by Correspondent over a two year period.

It is undisputed that Lovell & Malone had not originated any new residential mortgage loans for Capital after it resumed residential lending, and had originated only one commercial loan for them after January 1, 1986, a loan on a Florida retail center which had a remaining balance of $5,100,000.

On August 30, 1993, Lovell & Malone filed suit in Chancery Court to compel Capital to pay the termination fee. Capital filed a motion for summary judgment, asserting that the plaintiff's failure to originate new loans constituted such cause as would enable it to avoid payment of the termination fee under the contract. The trial court granted the motion for summary judgment.

On appeal, this court reversed the trial court (Appeal No. 01-A-01-9503-CH-00119, Filed September 6, 1995). We found that there was a question of material

fact as to whether Lovell & Malone was actually unable to produce a sufficient volume of mortgage loans, or whether the conditions imposed by Capital made it impossible for the correspondent to perform its obligations under the contract. Speaking through Judge Lewis, the court wrote:

> "Defendants contend they were entitled to set their own loan underwriting criteria for the making of mortgage loans or to change the criteria from time to time. The plaintiff agrees and so do we. Defendants could decline to make loans, either residential or commercial, and defendants did have a right to reject loans from the plaintiff based upon the defendants' new loan criteria. However, we are of the opinion that the defendants cannot rely on this right as a defense to the plaintiff's claim for a termination fee. To allow this defense would permit defendants to re-write the contract between the parties."

After a trial on the merits, the Chancellor entered a judgment in favor of the plaintiff in the amount of $136,438.21 plus pre-judgment interest, for a total judgment of $177,369.67. The present appeal followed.

## IV.

Appellant argues on appeal that its termination of the correspondent agreement should be considered to be for cause, because the correspondent violated two of the terms of the agreement by virtue of its inability to produce a reasonable and satisfactory volume of mortgage loans, and its transfer of the controlling interest in the correspondent in 1991 without the prior written approval of Capital. We will examine the first of these assertions in this section.

The appellee argues that Capital terminated the contract in September of 1992 solely for its own convenience, and that the reasons it later alleged were post hoc rationalizations, advanced solely for the purpose of enabling it to avoid paying a termination fee. The evidence clearly favors the appellee's interpretation of the

reasons for termination. The testimony of Mr. Hodge and of his supervisor Mr. Nelis indicates that the contract with Lovell & Malone was terminated as part of a larger program to reduce the number of correspondents it had to deal with to a few large companies, for the sake of the efficiencies and the economies of scale that such a reorganization would produce for Capital.

Lovell & Malone received the same form letter of termination as did the other correspondents whose contracts were ended at this time. It was only after Mr. Holland insisted that his company's 1962 contract entitled it to a termination fee, that Mr. Hodge invoked Section 6.02(e) of that contract and Lovell & Malone's lack of loan production as the reasons for termination.

While it is true that Lovell & Malone produced only one new loan for Capital after 1986, it managed to originate loans for other lenders during this period, including several million dollars worth of "jumbo" loans in the Nashville area each year. It does not appear to us that the failure of Lovell & Malone to produce loans for Capital over a period of more than two years was due to the correspondent's inability to perform, but rather to the heightened requirements that Capital imposed on its correspondents before it would accept any new loan originations from them.

At the conclusion of the trial, the trial court stated that the defendant had failed to prove the plaintiff's inability to produce loans, and thus the termination of the contract could not be considered to be for cause. The appellant argues on appeal that the trial court's statement indicated that it had improperly shifted the burden of proof. Capital contends that as plaintiff, Lovell & Malone was required to affirmatively prove all the elements of its claim, including the allegation that the termination of its contract was without cause. The appellee argues to the contrary that all it had to prove was the existence and validity of the contract, and its termination by Capital, in order to shift the burden of proof to the defendant, because the defendant's assertion

that it had cause to terminate the contract constituted an avoidance or affirmative defense that had to be specifically pled. See Rule 8.03 Tenn. R. Civ. P.

We do not believe, however, that we are required to settle this fine point of procedure, because the plaintiff did present sufficient evidence of its ability to originate both commercial and residential loans, in the form of uncontradicted testimony that it had placed a number of such loans with other companies after the defendant declared its unwillingness to accept such loans from the plaintiff.

**V.**

Capital's second argument on appeal pertains to the 1991 transfer of Lovell & Malone's stock. The appellant points out that the 1962 contract included the following as a cause for termination:

> 6.02 (g). If Correspondent is a corporation, the transfer of the controlling interest in Correspondent or, whether or not Correspondent is a corporation, a substantial change in management personnel of Correspondent, without the prior written approval of the Company.

It is undisputed that the prior written approval of Capital was not obtained when Mr. Holland's wife acquired the stock of Lovell & Malone. It is also undisputed that Capital became aware that its correspondent had come under new management in 1991, when Mr. Holland travelled to Louisville to introduce himself to Capital's loan officers.

Lovell & Malone contends that its failure to obtain the prior written approval of Capital for the acquisition of its stock is not properly before this court, because the issue was not raised during the course of trial proceedings. The appellee points out that it is not found in the pleadings or in the defendant's Motion for Summary Judgment or in its pre-trial brief, nor was it mentioned in the defendant's

- 8 -

opening statement or closing argument. In the alternative, appellee argues that Capital waived this contract provision by not raising it earlier in the proceedings.

Appellant asserts that the issue was raised at the trial level because its answer declared the termination to be for cause (even though that cause was not specified), and because the operative facts about Lovell & Malone's change of ownership were elicited from Mr. Holland during cross-examination. Appellant attempts to turn appellee's argument into a *reductio ad absurdum* by stating in its brief:

> "What Plaintiff actually seeks is for this Court to rule, as a matter of law, that every factual and legal point not mentioned in pretrial briefs, opening statement and oral argument at trial is waived on appeal. Such a rule would make for extremely lengthy briefs and opening and closing statements."

However, we do not believe that Lovell & Malone is attempting to place such an unrealistic burden on the parties or on the court. We believe to the contrary that the appellee is merely objecting to Capital's attempt to assert a previously unargued theory on appeal after its initial theory was rejected by the trial court.

Review by this court of the proceedings below is de novo upon the record, and thus this court in its discretion may even consider arguments that were not made on appeal, if supported by facts in the record, "in order to prevent needless ligitation, to prevent injury to the interests of the public, or to prevent prejudice to the judicial process." Tenn. R. App. P. Rule 13(b).

However we may also decline to consider arguments on appeal that were not raised below. Our function as an appellate court is to examine the record to determine if the court below committed reversible error. We are not obligated to grant relief to a party "responsible for error, or who failed to take whatever action is reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App.

P. Rule 36(a).  Thus, if the trial court erred in not ruling for Capital on the question of Lovell & Malone's change of ownership, this court could decline to rectify that error since the appellant failed to bring that issue to the trial court's attention.

We believe, however, that the appellant would not be entitled to prevail, even if it had made the same argument in the trial court that it makes on appeal. Appellant bases its argument upon a line of cases, starting with *College Point Boat Corporation v. U.S.*, 267 U.S. 12, 16, 45 S. Ct. 199, 200-201, 69 L.Ed 490, 493 (1925), which holds that a party may terminate a contract if legal justification exists for that action, even if the party was unaware of that justification at the time of termination.

None of the cases cited are quite on point, because the contract in the present case indicates that the appellant had an absolute right to terminate the contract for any reason whatsoever, or for no reason at all.  The only question before the court involved the contractual financial obligation following such a termination.

It appears to us that the obligations under the contract arise from the actual reasons for Capital's decision to terminate it, not the reasons that might have or could have been asserted.  Even if we assume, *arguendo* that Capital did not assert its rights under section 6.02(g) of the contract because it was not aware of the change of ownership until the taking of Mr. Holland's deposition on November 30, 1993, there are no indications in the record that it objected to either the new management or the new ownership until well after it discovered that its other theory would not entitle it to prevail in the trial court.

**VI.**

The judgment of the trial court is affirmed. Remand this cause to the Chancery Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
SAMUEL L. LEWIS, JUDGE